**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re: | Chapter 11 |
|---|---|
| NATURAL PRODUCT ASSOCIATION, | Case No. 19-11849 |
| Debtor.[1] | |

**DECLARATION OF DANIEL FABRICANT, PH.D. IN SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MOTIONS**

1. I am the CEO and President of the Natural Product Association ("***NPA***"), a Delaware non-profit non-stock corporation that is headquartered in the District of Columbia and doing business as Natural Products Association (the "***Debtor***"). I have been the CEO of the Debtor from April 2014 to the present. I previously served as the Director of the Division of Dietary Supplement Programs at the U.S. Food and Drug Administration (the "***FDA***"). In that position, I directed agency policy, public affairs and regulatory action regarding regulation of the dietary supplement industry for more than three years. Prior to the FDA, I was Vice President for Global Government and Scientific Affairs for NPA. I have a Ph.D. in Pharmacognosy from the University of Illinois at Chicago.

2. As President and CEO of the Debtor, I have extensive familiarity with the day-to-day operations, business affairs, and books and records of the Debtor. I am familiar with the Debtor's relationships with the lessors, trade vendors, and other parties necessary to the Debtor's ongoing business operations. I have also been intimately involved in the Debtor's preparation of this chapter 11 case.

3. I submit this declaration (the "***Declaration***") pursuant to 28 U.S.C. § 1746 in support of the Debtor's voluntary petition under chapter 11 of title 11 of the United States Code

[1] The last four digits of the Debtor's taxpayer identification number are (6719). The Debtor's headquarters is located at 440 1st Street N.W., Suite 520, Washington, DC 20001.

(the "***Bankruptcy Code***") and "first day" motions filed contemporaneously therewith. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and/or my opinion based upon personal knowledge and experience of the Debtor's business and financial condition. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**COMMENCEMENT OF CHAPTER 11 PROCEEDING**

4. On August 19, 2019 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "***Court***") under chapter 11 of the Bankruptcy Code. The Debtor intends to operate and maintain its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. This Declaration is comprised of four sections. Part I includes a description of the Debtor and its operations, Part II sets forth the relevant facts giving rise to this chapter 11 case, Part III provides detail on the Debtor's prepetition capital structure, and Part IV provides information and facts in support of the Debtor's "first day" motions filed by the Debtor concurrently with, or shortly after, the filing of this Declaration (the "***First Day Motions***"). I have reviewed and am familiar with the Debtor's First Day Motions.

**THE DEBTOR'S BUSINESS**

6. Founded in 1936, the Debtor is the nation's largest and oldest nonprofit organization dedicated to the natural products industry. Natural products are represented by a wide array of consumer goods that grow in popularity each year. These products include natural and organic foods, dietary supplements, probiotics, sports nutrition, medical/functional foods, personal care/cosmetics, homeopathics, "green" cleaning supplies, and pet products.

7. The Debtor represents over 1,000 members, including retailers, suppliers, manufacturers, distributors, brokers, consultants and other entities that support the natural

products industry. The Debtor's membership is diverse, ranging from the smallest health food store to the largest dietary supplement manufacturer.

8. As the leading voice of the natural products industry, the Debtor's mission is to advocate for the rights of consumers to have access to products that will maintain and improve their health, and for the rights of retailers and suppliers to sell these products. The Debtor advocates for its members in all branches and all levels of government. For example, the Debtor played a key role in the passage of the Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103-417, 108 Stat. 4325. This important legislation struck a balance between the need for consumers to have access to and information about safe and effective dietary supplements while also preserving the government's interest in protecting the public from unsafe products and false and misleading claims. Currently, the Debtor advocates before Congress, the FDA, the Federal Trade Commission, Department of Agriculture, Department of Health and Human Services, U.S. Trade Representative, Customs and Border Protection, and other federal and state agencies, legislatures, state attorneys' general offices, and the courts.

9. As part of its advocacy work, for the last 29 years the Debtor has held an Annual Natural Products Day in Washington, D.C. Members from the natural products industry from around the country travel to Capitol Hill to educate members of Congress and legislative staff about the important role natural products play in keeping Americans healthy and the public benefits of preventive care. That event is scheduled for September 10, 2019.

10. The Debtor's work is not limited to the United States. For example, the Debtor recently received Observer Status at the Codex Alimentarius Commission, part of the World Health Organization and the United Nation's Food and Agriculture Organization. The Codex Alimentarius, or "Food Code," is a collection of standards, guidelines and codes of practice intended to protect consumer health and promote fair trade practices.

11. The Debtor also operates programs to assist its members in complying with laws, regulations, and standards. For example, the Debtor's TruLabel® Program is a dietary supplement label registration and random-testing program started in 1990 and made a requirement for supplier membership in 1995. This internal oversight program was designed to create a high level of confidence with retailers and consumers that products sold in the marketplace are accurately labeled; establish an ongoing self-regulatory process within the industry; demonstrate industry maturity to legislators; and provide a comprehensive industry product database. TruLabel consists of a computerized database containing information from the label contents of dietary supplement products. Products are periodically selected for laboratory analysis to confirm the label; in other words, to verify that what is on the label is what is in the product. The Debtor also conducts certification programs, including the Good Manufacturing Practices Certification, Natural Seal Personal Care, and Natural Seal Home Care.

12. The Debtor regularly provides educational seminars, presentations, and conferences for its members and others in the industry. For example, the Debtor annually hosts a conference called "The Big Natural." The conference offers two days of industry-driven, educational sessions, workshop programming, case studies and interactive discussions. It brings together industry leaders, innovators and government officials who will share insights that will educate, empower and spark innovative ideas to drive the industry forward. This year, The Big Natural will be held September 11-12, 2019.

**EVENTS LEADING TO THIS CHAPTER 11 CASE**

13. The Debtor has operated at a loss for each of the past six years. However, the amount of these losses narrowed materially in 2017 and 2018. The Debtor has historically been required to dip into its reserves (the "***Reserves***") in order to fund its operating expenses.[2]

14. Additionally, since May 8, 2017, the Debtor has been engaged in arbitration with its former chief financial officer (the "***Arbitration***"). I, along with other of the Debtor's senior staff members, have been required to devote substantial time and resources to the Arbitration to the ultimate detriment of the organization, its members and its purpose. The chapter 11 filing will allow the Debtor the breathing spell necessary to redirect its efforts, including the time of its senior staff, to growing its core business of advocating for the interests of the natural products industry and attracting new members.

**THE DEBTOR'S CAPITAL STRUCTURE**

15. The Debtor does not incur secured debt to fund operations. Rather, operations are funded almost exclusively from membership dues, approximately eighty percent (80%) of which is funded by members of the Debtor's Board within the first two months of the calendar year. Membership dues, in the aggregate, which typically average approximately Two Million Dollars ($2,000,000.00) annually, are calculated based on the respective member's annual sales. Operating expenses, which average Two Million Dollars ($2,000,000.00) annually, are paid from such membership dues. As of the Petition Date, the Debtor has approximately Seven Hundred Fifty Thousand ($750,000.00) in unsecured trade debt. In addition to the unsecured trade debt, on August 15, 2018, a preliminary order was entered in the Arbitration, awarding the claimant

[2] The Reserves were originally funded in 2009 through the sale of the Debtor's tradeshow (called Natural Marketplace) to New Hope/Penton Media n/k/a Informa plc. The Reserves were subsequently supplemented by the proceeds of the sale in July 2016 of property located in Washington, D.C. that housed the Debtor's former headquarters. Since the sale in July 2016 no additional funds have been deposited into the account holding the Reserves (the "***Reserve Account***"), and any increase in the balance of the Reserve Account is the result of

(the "***Claimant***") approximately $771,000.00 in compensatory damages. The Claimant has sought punitive damages, attorneys' fees, and other damages; however, as of the Petition Date, the arbitrator has not entered a ruling on these additional monetary claims.

16. As a not for profit corporation, the members do not hold any equity interest in the Debtor nor do they have any rights to the Debtor's property.

## FIRST DAY MOTIONS[3]

17. Concurrently with the filing of the chapter 11 case, the Debtor filed certain First Day Motions which are designed generally to meet the goals of preserving and protecting the Debtor's chapter 11 estate, including by paying certain claims of employees and continuing employee programs, maintain utilities and use of the Debtor's cash management systems and business forms. I believe that the relief sought in the First Day Motions are tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to reorganize efficiently and successfully.

### I. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing (I) Payment of Prepetition Employee, Wages, Salaries, and Other Compensation; (II) Reimbursement of Prepetition Employee Business Expenses; (III) Payment of Prepetition Tax and Other Withholdings to Third Parties; (IV) Contributions to Prepetition Employee Health and Other Benefit Programs and Continuation of Such Programs; (V) Payment of Workers' Compensation Obligations and other Insurance Premiums; (B) Authorizing Banks to Honor and Process Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief (the "Employee Motion")

18. By the Employee Motion, the Debtor is requesting entry of interim and final orders (a) authorizing the Debtor to pay certain prepetition claims for (i) employee wages, salaries, and other compensation, (ii) federal and state withholding and/or payroll taxes, (iii) contributions to employee benefit plans, and (iv) all other employee-related benefits that the

investment and/or market performance. However, due to the Debtor's historical performance, the Reserves continue to be reduced to cover operating expenses.

Debtor pays in the ordinary course of its business (collectively, the "***Employee Obligations***"); (b) scheduling the Final Hearing to consider entry of the Final Order; and (c) granting such other and further relief as may be appropriate

19. As of the Petition Date, the Debtor employs approximately six (6) individuals, all of whom are full-time (collectively, the "***Employees***"). None of the Debtor's employees is subject to a collective bargaining agreement.

**A. Wages**

20. In the ordinary course of business, the Debtor pays its Employees wage and salary obligations (collectively, the "***Wages***") on a salaried basis. All of the Employees receive their wages, salaries, and other compensation by direct deposit. Employees are paid in arrears on the 15th and last days of the month[4] for all time worked in the preceding period.

21. Payroll is funded to the Paychex (the "***Payroll Processor***") two business days before the date of payment. As of the Petition Date, the Debtor estimates it owes Employees approximately Seven Thousand Dollars ($7,000.00) on account of accrued but unpaid Wages, all of which will become due and owing within the first twenty-one (21) days of this Chapter 11 Case (collectively, the "***Unpaid Wages***"). The Debtor believes that, as of the Petition Date, no Employee is owed Unpaid Wages in excess of the cap under section 507(a)(4) of the Bankruptcy Code.

**B. Reimbursable Expenses**

22. Prior to the Petition Date and in the ordinary course of business, the Debtor reimbursed certain Employees for certain allowed business and travel-related expenses incurred on behalf of the Debtor (the "***Reimbursable Expenses***"). Employees pay for such expenses

---

[3] Capitalized terms used but not otherwise defined in this section of the Declaration shall have the meaning ascribed in the applicable First Day Motions.

[4] If the 15th or last day of the month falls on a Saturday, Sunday or holiday, the employees are paid on the preceding business day.

directly from their own funds and are reimbursed upon the submission of an expense reimbursement form itemizing the applicable business expenses. Reimbursement is contingent on the Debtor's determination that the charges are for legitimate, reimbursable business expenses.

23. Reimbursable Expenses approximate to Three Hundred Dollars ($300.00) per month. As of the Petition Date, the Debtor estimates that it owes approximately Eighty-Eight Dollars ($88.00) in outstanding prepetition Reimbursable Expenses. The Debtor's incurrence of Reimbursable Expenses varies from month-to-month. As a result, the Debtor cannot accurately estimate prepetition, unpaid Reimbursable Expenses.

24. Employees incurred the Reimbursable Expenses as business expenses on the Debtor's behalf and with the understanding that they would be reimbursed. To avoid harming Employees who incurred the Reimbursable Expenses, the Debtor requests authority to (a) continue paying the Reimbursable Expenses in accordance with prepetition practices, including payment to and in adherence with the Debtor's policy for reimbursing Employees such expenses, and honor any prepetition obligations related thereto to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses; (b) modify their prepetition policy relating thereto as they deem appropriate without the need for further court approval; and (c) pay all Reimbursable Expenses to Employees that (i) accrued prepetition and (ii) accrue postpetition but relate to the prepetition period. The Debtor requests authority to pay up to Three Hundred Dollars ($300.00) on an interim basis and One Thousand Dollars ($1,000.00) on a final basis on behalf of the Reimbursable Expenses. The Debtor also seeks authority to continue its reimbursement policy in the ordinary course during the administration of the Chapter 11 Case.

**C. Holidays/Paid Time-Off and Leaves of Absence**

25. The Debtor offers full-time Employees pay for predetermined holidays ("***Paid Holidays***"). In addition, Employees are eligible for paid time away from work based on the employee's length of service. These absences include personal illness, vacation, preventive care, care for a family member, school activities, medical/dental appointments, personal business and emergencies (collectively, "***Paid Time Off***"). The maximum Paid Time Off an Employee may accrue at any time is ten hours per month if they have been with the Debtor less than two years and 13.33 hours per month if they have been with the Debtor more than two years or serve at a director level. Employees can accrue a maximum of 240 hours of Paid Time Off. If an Employee's accrued but unused Paid Time Off reaches the maximum, the Employee will cease to accrue Paid Time Off. The Debtor anticipates that certain Employees will seek to use or redeem for cash Paid Time Off accrued during the prepetition period after the Petition Date ("***PTO Payouts***"). As of Petition Date, the Debtor estimates that its accrued liability in connection with unused Paid Tim Off equaled approximately Seventy Thousand, Two Hundred, Twenty-Eight Dollars and 37/100 ($70,228.37). All of the Paid Time Off is fully-vested and eligible to be redeemed; however, no PTO Payouts will be honored unless required by applicable state law.

26. The Debtor respectfully requests permission to honor all unused Paid Time Off that accrued prior to the Petition Date, in accordance with its historical practices and in the ordinary course of business.[5] The Debtor also seeks authority to continue to incur and pay eligible Employees for Paid Holidays consistent with past practices.

---

[5] In addition, the Debtor also provides all Employees with other leaves of absence as required by law (collectively, the "***Leave of Absence***"). Leaves of Absence include jury duty, voting leave, and bereavement leave. Employees do not accrue Leaves of Absence over time, and Leaves of Absence are not reflected as a liability on the Debtor's respective balance sheets.

**D. <u>Deductions and Withholdings</u>**

27. During each applicable payroll period, the Debtor routinely deducts certain amounts from its Employees' gross pay, including, without limitation, pre-tax and after-tax deductions payable pursuant to the Employee Benefits Programs discussed herein (*e.g.*, contributions relating to health care benefits and 401(k) and other miscellaneous deductions (collectively, the "***Deductions***"). On a monthly basis, the Debtor deducts and remits to appropriate third-party recipients approximately Twelve Hundred Dollars ($1,200.00) from the Employees' paychecks for the Deductions. As of the Petition Date, there are no Employee Deductions that have been withheld and not yet remitted to third-party recipients. Out of an abundance of caution, the Debtor requests authority to remit any unpaid prepetition Deductions that may exist. Additionally, the Debtor seeks authority to continue deducting amounts from the applicable Employee's wages and salaries and forwarding Deductions to the appropriate third-party recipients on a postpetition basis, in the ordinary course of business, and consistent with past practices. The Deductions represent earnings that applicable authorities have designated for deduction from Employees' paychecks and, thus, may not be property of the Debtor's estate.

28. In addition to the Deductions, the Debtor is required by law to withhold amounts related to federal income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate taxing authority (collectively, the "***Withheld Amounts***"). The Debtor is also required to pay additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "***Payroll Taxes***"). On a monthly basis, the Debtor remits approximately Nineteen Thousand Dollars ($19,000.00) in Payroll Taxes, which amounts include employer taxes plus what is withheld and remitted on behalf of the Employee. As of the Petition Date, the Debtor estimates that there are no accrued and unpaid Payroll Taxes (collectively, the "***Unremitted Payroll Taxes***") as those amounts are paid in connection with

deductions made by the Payroll Processor. Because the Deductions and Unremitted Payroll Taxes are not property of the Debtor's estate, the Debtor requests that the Court authorize the Debtor to transmit these amounts, if any, all of which will become due within the first twenty-one (21) days of this Chapter 11 Case, to the appropriate parties in the ordinary course of business.

**E. Employee Benefits Programs**

29. In the ordinary course of business, the Debtor offers its full-time Employees the opportunity to participate in a number of health and welfare benefits programs, including medical and dental insurance, life and disability insurance, and other employee benefit plans as described below (collectively, the "***Employee Benefits Programs***"). Maintaining these benefits and honoring obligations thereunder is necessary to preserve employee morale and maintain the stability of the Debtor's workforce during this Chapter 11 Case.

30. Medical Plan. The Debtor offers a medical plan to eligible Employees (the "***Medical Plan***"), which is administered by DC Healthlink. The coverage in the Medical Plans and associated premiums differ depending on the level of coverage Employees elect to receive and whether the Employee has dependents covered by the applicable plan. As of the Petition Date, the Debtor estimates that there are no pre-petition premiums outstanding for the Medical Plan as the Debtor paid such premiums on an annual basis several months before the Petition Date.

31. Dental Plan. Full-time Employees are eligible to enroll in a dental plan (the "***Dental Plan***") administered by MetLife. As of the Petition Date, the Debtor estimates that there are no amounts owed to MetLife on account of the Dental Plan.

32. Company-Paid Plans. The Debtors provide full-time Employees with a number of company-paid benefits, including Life/AD&D, short term disability, telemedicine, health

advocacy, and an employee assistance program (collectively, the "***Company-Paid Plans***"). The Company-Paid Plans are administered by MetLife. As of the Petition Date, the Debtor estimates that there are no amounts owed to the plan administrators on account of the Company-Paid Plans.

33. 401(k) Plan. The Debtor maintains for the benefit of eligible Employees an employee savings plan, administered through Principal, which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "***401(k) Plan***"). The Debtor does not currently match amounts contributed toward the 401(k) Plan but has in previous years made matching contributions. There are approximately two participants in the 401(k) Plan. The Debtor withholds certain amounts from participating Employee's paychecks and contribute such amounts to the 401(k) Plan (the "***Employee 401(k) Contributions***"). The Debtor estimates that it withholds a total of approximately Twelve Hundred Dollars ($1,200.00) in Employee 401(k) Contributions each month.[6] As of the Petition Date, there are no amounts that have been withheld and not yet remitted to the 401(k) Plan administrator. The Debtor requests authority to continue the Employee 401(k) Contributions on a postpetition basis.

34. Other Policies and Benefits. Eligible Employees have the benefit of certain other policies and benefits, including, but not limited to, jury duty, bereavement leave, voting leave, military duty leave, some of which are mandated or encouraged by law and some of which may have pay or benefits components. The Debtor seeks authorization to continue the aforementioned Policies and Benefits and to make any payments on account of any accrued but unpaid amounts owing thereunder.

---

[6] The Debtor's books and records show that it has previously made a matching contribution to the 401(k) Plan in the amount of Twelve Hundred Dollars ($1,200.00).

35. The Debtor requests authority to (a) continue the Employee Benefits Programs in the ordinary course of business, (b) continue making the above-described contributions to the Employee Benefits Programs, and (c) pay any amounts related thereto, including premiums, claims amounts, and administration fees, to the extent that they remain unpaid as of the Petition Date in the ordinary course of business. Specifically, the Debtor seeks to pay all outstanding amounts, if any, in pre-petition administrative fees, monthly premiums, and funding for Employee Benefits Programs on an interim basis and on a final basis subject to the limits set forth herein.

**F. Payroll Processor**

36. The Debtor uses the Payroll Processor to administer payroll funds made available to Employees through direct deposit. The Payroll Processor's responsibilities include processing payroll and transferring funds from the Debtor to its Employees and to the relevant taxing authorities. The Debtor pays the Payroll Processor approximately Two Hundred, Eighty Dollars ($280.00) per month. Because the services provided by the Payroll Processor are crucial to the smooth functioning of the Debtor's payroll system, the Debtor requests permission to pay any unpaid Payroll Processor fees, and to continue to pay fees that accrue during this bankruptcy case in the ordinary course of business.

37. For the reasons set forth in the Employee Motion, I believe that the relief requested is in the best interest of the Debtors, their estates and creditors.

**II. DEBTOR'S MOTION FOR THE ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR'S PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT, (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES, AND (III) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE (the "Utilities Motion")**

38. Pursuant to the Utilities Motion, the Debtor seeks the entry of interim and final orders (a) approving the Debtor's proposed form of adequate assurance of postpetition payment to its utilities, as that term is used in section 366 of the Bankruptcy Code (the "***Utility Companies***"), of a two (2) week deposit for each Utility Company for a total of approximately $600.00; (b) approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtor solely on the basis of the commencement of this case, a debt that is owed by the Debtor for services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtor's Proposed Adequate Assurance.

39. In connection with the operation of its business and the management of its property, the Debtor obtains utility services, including electric, gas, water, oil & diesel, sewer, trash removal, ISP, telephone, cable and other similar services (collectively, the "***Utility Services***"), from the Utility Companies covering a number of utility accounts. The relief requested in this Motion is for all Utility Companies providing Utility Services to the Debtor and is not limited to those listed on the list of providers of Utility Services attached to the Utilities Motion as **Schedule 1** (the "***Utility Company List***"). The Debtor has made an extensive and good faith effort to identify all of the Utilities that provide them Utility Services and to include them in **Schedule 1**. Nevertheless, the Debtor reserves the right to supplement **Schedule 1** by filing a notice (a "***Supplemental Notice***," and together with Schedule 1, as may be so supplemented, the "***Utilities List***") at a later date with the Court if necessary.

40. On average, prior to the Petition Date, the Debtor spent approximately $1,000.00 each month on account of Utility Services. As reflected on **Schedule 1**, only one (1) of the

Debtor's Utility Companies holds a deposit, which deposit equals approximately two-months' costs for that Utility Company.

41. Uninterrupted Utility Services are essential to the Debtor's business operations during the pendency of this Chapter 11 Case. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted, and such disruption would jeopardize the Debtor's reorganizational efforts. It is essential that the Utility Services continue uninterrupted. Accordingly, the Debtor seeks to establish an orderly process for providing adequate assurance to the Utility Companies without jeopardizing the Debtor's business operations.

42. I maintain that the relief requested in this Motion strikes a fair balance between protecting the rights of the Utility Companies and the rights of the Debtor under the Bankruptcy Code and the need for the Debtor to continue to receive, for the benefit of its estate, the Utility Services upon which it depends. I do not believe that the Utility Companies will be prejudiced by the Proposed Adequate Assurance, the requirement to provide the Debtor with uninterrupted access to Utility Services, and the procedures for resolving objections to the Proposed Adequate Assurance.

## III. DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE CONTINUED USE OF THE DEBTOR'S CASH MANAGEMENT SYSTEM AND (B) EXTENDING THE TIME TO COMPLY WITH THE REQUIREMENTS OF SECTION 345(b) OF THE BANKRUPTCY CODE (the "Cash Management Motion")

43. Pursuant to the Cash Management Motion, the Debtor seeks the entry of interim and final orders authorizing the Debtor to continue using its cash management system, existing bank accounts, and business forms and granting Debtor a forty-five (45) day extension to comply with the investment and deposit requirements of section 345(b) of the Bankruptcy Code.

**A. <u>The Debtor's Bank Accounts</u>**

44. As of the Petition Date, the Debtor's Cash Management System employed a total of three (3) bank accounts (collectively, the "***Bank Accounts***"), including one (1) operating account at Eagle Bank holding dues received from members and used in the daily operations of the Debtor, and two investment accounts with Morgan Stanley holding the Reserves (collectively with any other institutions with which the Debtor maintains or established deposit accounts or investment accounts, the "***Banks***").

45. **<u>Schedule 1</u>** attached to the Cash Management Motion sets forth for each of the Bank Accounts the name of the institution at which the account is maintained, the account number (last four digits only) and a description of the purpose of the account. The Debtor manages its cash receipts, transfers and disbursements through the Bank Accounts. In doing so, the Debtor routinely deposits, withdraws and otherwise transfer funds to, from and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. On a daily basis, the Debtor processes numerous transactions through the Cash Management System as described below. The Debtor maintains current and accurate records of all transactions processed through the Cash Management System.

**B. <u>The Debtor's Cash Management System and Bank Accounts</u>**

46. Prior to the Petition Date, in the ordinary course of business the Debtor employed a cash management system to efficiently collect, transfer, and disburse funds generated by its business operations (the "***Cash Management System***"). The Cash Management System facilitates the Debtor's cash forecasting and reporting, as well as enables the Debtor to maintain control over the administration of its Bank Accounts and to monitor and record the collection and disbursement of funds. The Debtor does not engage in any intercompany transfers.

47. Among other benefits, the Cash Management System permits the Debtor to accurately monitor cash availability at all times and permits the Debtor to centrally manage and track the collection and transfer of funds, which reduces administrative burden and expense and maximizes interest income.

> a. Operating Account. The Debtor maintains an operating account (the "***Operating Account***") at Eagle Bank. The Operating Account receives payments from members directly into the Operating Account and all disbursements, including payroll, is funded from such Operating Account.

> b. Investment Accounts. The Debtor maintain two investment accounts (the "***Investment Accounts***") with Morgan Stanley for purposes of investment of the Reserves and to routinely cover operating shortfalls for the Operating Account.

48. Eagle Bank is an authorized bank depository by the Office of the United States Trustee for Region 3 (the "***U.S. Trustee***") pursuant to the U.S. Trustee's Operating Guidelines for Chapter 11 Cases (the "***UST Operating Guidelines***"). Although Morgan Stanley is not identified as an authorized depository, it is a highly-rated financial institution that is well-capitalized and financially stable.

**C. The Debtor's Business Forms**

49. In addition to the Cash Management System and Bank Accounts, the Debtor uses in the ordinary course of business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices) (collectively, the "***Business Forms***").

50. Most of the Business Forms are printed on an as-needed basis from an electronic template and therefore, the Debtor intends to designate "Debtor-in-Possession" on such forms. However, with respect to preprinted Business Forms, the Debtor requests that it be authorized to continue to use these preprinted Business Forms on a postpetition basis and once its existing stock is depleted, the Debtor will then replace them with stock containing the "Debtor-in-

Possession" designation. The Debtor submits that it would be expensive and wasteful, and disruptive to the Debtor's business, to destroy all of these forms and order new ones. Absent this relief, the estate will be required to bear a potentially significant expense that the Debtor believes is unwarranted, without any meaningful corresponding benefit, and would unnecessarily distract the Debtor away from its efforts from administering this Chapter 11 Case.

51. The Debtor utilizes the Cash Management System in the ordinary course of its business. The Cash Management System currently in place enables the Debtor to (a) closely control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the efficient movement of funds. In light of the manner in which the Debtor generates and tracks revenues related to its operations, any disruption in the Debtor's cash management procedures will hamper the Debtor's reorganizational efforts. Altering the Cash Management System may disrupt (i) payments to key vendors, contractors, and employees, and (ii) the receipt of funds from the Debtor's members. Therefore, it is essential that the Debtor be permitted to continue to use its Cash Management System in accordance with its existing cash management procedures.

52. I respectfully submit that under the circumstances, the maintenance of the Debtor's Cash Management System in substantially the same form as it existed prior to the Petition Date is in the best interests of the Debtor's estate and creditors. Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtor's stabilization of their postpetition operations and (b) assist the Debtor in its effort to maximize value for its estate.

53. In order to ensure that the Debtor's members continue timely to pay their dues and vendors continue to provide goods and services to the Debtor, it is critical that the Debtor

maintains as much consistency as possible during the early stages of this case in order to avoid serious disruption to its operations. Changing accounts could significantly and negatively impact Debtor's cash flow as it takes a substantial amount of time to open new accounts.

54. By virtue of the nature and scope of the Debtor's business operations and the number of members and suppliers of goods and services with whom the Debtor deals on a regular basis, it is important that the Debtor be permitted to continue to use the preprinted Business Forms without alteration or change and without the "Debtor-in-Possession" designation. Otherwise, the estate will be required to bear a potentially significant expense, which the Debtor respectfully submits is unwarranted. Once such preprinted Business Forms are depleted, the Debtor will then seek to replace them with forms containing the "Debtor-in-Possession" designation.

55. The Debtor requires this relief to minimize the disruption of the Cash Management System and its Bank Accounts, and to assist it in accomplishing a smooth transition to operating in Chapter 11.

I, Daniel Fabricant, Ph.D, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Daniel Fabricant, Ph.D.
President and CEO
Natural Product Association